2017 Ark. App. 669

**Robin HOLLOWAY and Nathan Warren, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees**

**No. CV–17–671**

Court of Appeals of Arkansas, DIVISION III.

Opinion Delivered December 6, 2017

694

Tina Bowers Lee, Arkansas Public Defender Commission, Los Angeles, for appellant Robin Holloway.

Dusti Standridge, for appellant Nathan Warren.

Andrew Firth, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, by: Keith L. Chrestman, attorney ad litem for minor child.

DAVID M. GLOVER, Judge

Robin Holloway and Nathan Warren separately appeal from the termination of their parental rights to their daughter, E.W. They each challenge the trial court's statutory-grounds and best-interest findings. We affirm both terminations.

E.W. was born on October 19, 2015. The Arkansas Department of Human Services (DHS) took a 72–hour hold on her because Robin already had an open dependency-neglect case concerning E.W.'s five half-siblings. The other five children were in foster care, and E.W. was "added to the open case." The instant appeal deals only with E.W. By the time E.W. was born, Robin had been receiving services since March 13, 2014. During that time, Robin had not been able to achieve a trial placement or unsupervised visitation—much less reunification with the other five children. On October 26, 2015, DHS filed a petition for emergency custody and dependency-neglect. The verified affidavit detailed the long history of DHS with Robin and her other children, which began on April 19, 2007, and continued through the birth of E.W. The affidavit further provided that E.W.'s health and safety was in danger because of allegations involving physical abuse, sexual abuse, extreme neglect, and inadequate supervision. The trial court entered an ex parte order for emergency custody the same day.

On November 4, 2015, the trial court entered a probable-cause order. Several continuances were granted by the trial court, and on April 7, 2016, Nathan filed a petition for acknowledgment of parental/legal rights and a petition for custody. The actual adjudication order was filed in open court on April 29, 2016, even though the

trial court's letter opinion states that "[o]n February 12, 2016, [E.W.] was adjudicated dependent-neglected based upon the mother's failure to protect against a Level 3 sex offender, failure to comply with Court Orders in an open case on five (5) half-siblings who were also adjudicated dependent-neglected and having five (5) half-siblings remaining in foster care."

On June 1, 2016, DHS filed its petition for termination of parental rights. The petition lists all six children as respondents, but as mentioned at the outset, the instant appeal deals only with the termination of Robin and Nathan's parental rights to E.W. On July 13, 2016, the trial court entered a review order that, apparently, was based on a May 10, 2016 hearing. On July 15, 2016, the trial court entered an agreed order of continuance on the petition to terminate regarding E.W., extending the date to September 29, 2016. On August 29, 2016, DHS filed a motion to change the termination hearing scheduled for September to a permanency-planning hearing, to continue the termination hearing to October 28, 2016, and to terminate reunification services for Robin Holloway and Notice of Hearing. The motion explained: "The grounds and supporting facts for recommending no reunification services are as follows: The mother, Robin Holloway, on August 18, 2016, had her parental rights involuntarily terminated to the siblings of [E.W.]."

On August 29, 2016, DHS also filed its amended petition for termination of parental rights for E.W. Several continuances were granted, and on January 31, 2017, DHS filed another petition for termination of parental rights. Finally, on March 6, 2017, and continued on March 27, 2017, the termination hearing was held. On May 5, 2017, the trial court prepared a letter opinion, filed the same date, and on May 15, 2017, the order terminating Robin and Na-

than's parental rights was entered. These appeals followed.

We review termination-of-parental-rights cases de novo. *Hudson v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 629, —— S.W.3d ——. Our inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.* We give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.* The termination-of-parental-rights analysis is twofold, requiring the trial court to find that a parent is unfit and that termination is in the best interest of the child. *Id.* The first step requires proof of one or more of the nine enumerated statutory grounds for termination. *Id.*; Ark. Code Ann. § 9–27–341(b)(3)(B) (Repl. 2015). The best-interest determination must consider the likelihood that the child will be adopted and the potential harm caused by returning custody of the child to the parent. Ark. Code Ann. § 9–27–341(b)(3)(A). The trial court, however, does not have to determine that every factor considered be established by clear and convincing evidence. *Hudson, supra.* Instead, after considering all the factors, the evidence must be clear and convincing that the termination is in the best interest of the child. *Id.*

### Statutory Ground Supporting Termination of Nathan's Parental Rights

Nathan contends that the trial court clearly erred in finding that the following three statutory grounds existed in terminating his parental rights: 1) subse-

quent factors, 2) 12 months out of the home and conditions not remedied, and 3) aggravated circumstances. Proof of one ground is sufficient to support a termination of parental rights. *Reid v. Arkansas Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918. Because we find no clear error in the trial court's finding that DHS proved the subsequent-factors ground, it is only necessary to discuss that ground for termination.

Arkansas Code Annotated section 9–27–341(b)(3)(B) provides in pertinent part:

> (vii)(*a*) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

This ground requires proof that 1) other factors arose subsequent to the filing of the original petition for dependency-neglect; 2) those factors demonstrate placement of the child in the parent's custody would be contrary to the child's welfare; and 3) despite the offer of appropriate family services, the parent demonstrated either an incapacity or an indifference to remedy the subsequent factors or rehabilitate the circumstances that prevent the child's placement in the parent's custody.

The trial court's letter opinion explained that, in completing the sex-offender community-notification assessment, Nathan revealed new facts, *i.e.*, that he had had sexual intercourse with three different fifteen-year-old girls and a sixteen-year-old girl when he was twenty; that he pled guilty to carnal abuse of his sister when he

was eighteen; that the carnal-abuse conviction resulted in his sex-offender-registry requirement; that he failed to register a total of six times; that he went to jail for failure to register in 1998; and that he also had three or four domestic-battery convictions. The trial court noted Nathan testified he did not refuse sex-offender-specific treatment in the Arkansas Department of Correction but that treatment was not available to him, and he claimed to have received treatment in 1997 or 1998 but provided no proof that he had done so.

Nathan acknowledged in his own testimony about these subsequent factors that he had a history with law enforcement; that he had a history with domestic abuse; that he had a history of sexual misconduct with women besides the reason he was found to be a sex offender (carnal abuse of his sister); that he has admitted forcing a woman to have sex with him ("but that's because she told me that I did"); that the last time he was incarcerated was from February 2 until June 2 "of last year" for revocation of probation on the failure to register and failure to pay fines; and that he had about six failure-to-registers and three or four domestic batteries.

Holly Johnson, the caseworker, acknowledged deficiencies in her handling of the case but stated that she did make two referrals for counseling for Nathan; that the first one was made when E.W. first came into care; and that Nathan was incarcerated for a while, so the second one was made when he was no longer incarcerated. She stated that Nathan would have known the referrals were made on his behalf because, as his caseworker, she would have told him that to her knowledge, Nathan never took advantage of those counseling referrals. She further testified that E.W. could not be returned to Nathan's custody because he had not completed any counseling through DHS to

have a "therapist be able to say he would be okay around children or no this would never work out."

Nathan acknowledged that DHS offered him some services, but much of his argument rests in the fact that DHS's initial concern with him was his status as a level 3 sex offender, and that with no help from DHS, he was able to get his status reassessed and lowered to level 2. DHS counters that E.W. had been in foster care for fifteen months when Nathan made his effort to have his sex-offender status reassessed; that his status itself was not a subsequent factor, rather, it was what was revealed through the process of reassessment—a troubling history of other sexual encounters with underage girls, domestic abuse, and several failures to register as a sex offender; and that he had also failed to obtain stable housing and employment.

The trial court credited the caseworker's testimony, finding in the letter opinion that "[Nathan] asked for counseling and [Holly] made a referral for him. Because he went to jail he was not able to follow through with the first referral. When he was released from jail, she made another referral for counseling for him. He did not go for his appointment."

In short, the trial court was presented with evidence 1) that subsequent factors arose after the dependency-neglect petition was filed because information developed that Nathan had a more extensive history of sexual abuse, had failed to register several times, and had three to four instances of domestic abuse; 2) that those factors demonstrated E.W.'s placement with Nathan was contrary to E.W.'s welfare; and 3) that despite the offer of services, Nathan demonstrated either an incapacity or an indifference to remedy the subsequent factors because the trial court credited the caseworker's testimony that she made a counseling referral that Nathan did not take advantage of. We are not

left with a definite and firm conviction the trial court made a mistake in finding that DHS proved this statutory ground for termination.

### Statutory Ground Supporting Termination of Robin's Parental Rights

The statutory ground relied upon by the trial court in terminating Robin's parental rights to E.W. was the aggravated circumstance of prior termination of parental rights to a sibling. More specifically, Arkansas Code Annotated section 9–27–341(b)(3)(B) provides in pertinent part:

(ix)(a) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

. . . .

(3) (A) Have subjected any juvenile to aggravated circumstances.

(B) "Aggravated circumstances" means:

. . . .

(4) Have had his or her parental rights involuntarily terminated as to a sibling of the child[.]

It is undisputed that Robin's parental rights to five other children, E.W.'s half siblings, were terminated just a few months before the termination in this case. In fact, the case concerning the other children was still open when the emergency hold was taken on E.W. at the hospital when she was born. Proof establishing only one statutory ground is sufficient to support the termination of parental rights, *Reid, supra,* and we find no clear error in the trial court's finding that this statutory ground was proved.

### Best–Interest Findings Regarding Nathan and Robin

The two prongs that must be considered in determining whether termination is in the child's best interest are 1)

adoptability and 2) the potential harm the child would face if there were continuing contact with the parent. *Hudson, supra.* The trial court considered these factors with respect to both Nathan and Robin and concluded it was in E.W.'s best interest to terminate their parental rights. Counsel for each parent acknowledges that there was sufficient evidence of E.W.'s adoptability. With respect to Nathan, the evidence supporting the subsequent-factors ground for termination also demonstrates the likelihood of potential harm if E.W. were returned to Nathan. With respect to Robin, the caseworker's testimony demonstrated that Robin was continuing to associate with Nathan, despite Robin's denials. In addition, the evidence also demonstrated that after seventeen months Robin still did not have stable employment or income. We find no clear error in the trial court's finding that it was in E.W.'s best interest to terminate the parental rights of both parents.

Affirmed.

Gladwin and Hixson, JJ., agree.